UNITED STATES of America, Appellee,

v.

Mario GIGANTE, Defendant-Appellant.

No. 376, Docket 83–1229.

United States Court of Appeals,
Second Circuit.

Argued Nov. 4, 1983.

Decided Feb. 21, 1984.

Certiorari Denied May 21, 1984.
See 104 S.Ct. 2390.

**80**

Bruce A. Baird, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty. for the Southern Dist. of N.Y., Robert S. Litt, Asst. U.S. Atty., New York City, on the brief), for appellee.

Alan M. Dershowitz, Cambridge, Mass. (Nathan Z. Dershowitz, Dershowitz & Eiger, New York City, on the brief), for defendant-appellant.

Before MANSFIELD, KEARSE and PRATT, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Mario Gigante appeals from a judgment entered in the United States District Court for the Southern District of New York, Charles E. Stewart, Jr., *Judge*, after a jury trial, convicting him and a codefendant, Michael Vodola, of two counts of making extortionate extensions of credit, two counts of using extortionate means to collect such extensions of credit, and two counts of conspiring to commit those substantive offenses, in violation of 18 U.S.C. §§ 891, 892, 894, & 2 (1982). Gigante was sentenced to concurrent eight-year terms of imprisonment on all six counts.[1] On appeal, Gigante asserts that he was denied a fair trial principally because of (1) prejudicial publicity to which the jury was exposed on the eve of its deliberations, (2) erroneous evidentiary rulings by the trial court, and (3) improper questioning by the prosecutor. We affirm the judgment of conviction.

## I. BACKGROUND

Gigante and Vodola were indicted in a twelve-count indictment charging them with one count of conspiring to make extortionate extensions of credit and to threaten violence as a means of coercing repayment, in violation of 18 U.S.C. §§ 891 and 892 (count 1); six counts of making specified extortionate extensions of credit, in violation of §§ 891, 892, and 2 (counts 2–7); one count of conspiring to collect repayments by extortionate means, in violation of

§§ 891 and 894 (count 8); and four counts of using extortionate means to collect repayments, in violation of §§ 891, 894, and 2 (counts 9–12). Counts 4, 5, and 10 were dismissed on motion of the government before the close of its case.

### A. *The Evidence of Gigante's Loansharking Activities*

The government's proof at trial, the sufficiency of which is not challenged by Gigante, was presented primarily through the testimony of loanshark victim Ralph Sirabella, tape-recorded conversations Sirabella had with Vodola and other persons, Sirabella's written records of the payments he made to Vodola and Gigante, and Vodola's written records of payments he collected for Gigante from Sirabella and others. Sirabella, a butcher by trade, was a lifelong gambler who frequently borrowed money from loansharks to meet his gambling debts. In 1977, Sirabella met Vodola, with whom he placed bets; when Sirabella needed more money to cover his bets, Vodola told him about a man named Mario who Vodola said was connected to organized crime and would lend Sirabella money. Soon thereafter, Vodola introduced Sirabella to Mario Gigante, who loaned Sirabella $10,000, which Sirabella was to repay at the rate of $200 per week until he had paid a total of $20,000. Vodola described to Sirabella how other persons who owed money to Gigante were beaten when they failed to make payments on time.

At the same time, Sirabella owed money to other loansharks, two of whom beat him and threatened him late in 1979 when he failed to pay them on time. Unable to keep up with all of the payments due all of the loansharks, Sirabella told Vodola about the beating he had received and asked for help. In early 1980, Vodola and Gigante consolidated all of Sirabella's loans, doubled the total amount of his outstanding debt to an amount in excess of $200,000 while giving him no cash, and arranged for a repayment

---

1. Gigante remains free on bail pending the outcome of this appeal. Vodola, who has not appealed his conviction, is presently serving the sentence imposed on him.

schedule of $600 per week. Gigante threatened Sirabella on several occasions when he was late with his payments, and once punched him in the face. In January of 1981, afraid for his life, Sirabella went to the FBI for help. He began to tape record conversations he had with Vodola, during which he was threatened repeatedly with what Gigante would do to him if he failed to make his payments.

In early February 1981, Sirabella found that his apartment had been entered in his absence by someone with a key and that his tape recorder, which showed he had been cooperating with the FBI, had been tampered with. The evidence revealed that Sirabella's landlord, who had keys to the apartment, was acquainted with Gigante. Following the break-in, Vodola behaved in a markedly more friendly manner toward Sirabella; he made no more threats, he no longer demanded payments, and he volunteered that Gigante would help Sirabella get a bank loan if he needed one.

## B. *The Publicity During Trial*

Trial had commenced on February 16, 1983. On Friday, March 4, the government presented its closing argument to the jury; defense summations were scheduled for Monday, March 7. On Sunday, March 6, the *New York Daily News* published a lengthy article about organized crime activity on the New Jersey waterfront, mentioning loansharking as one of the activities in which the mob engaged. The article was accompanied by a picture of Gigante, whom the article described as an "alleged Genovese capo." The article cited as its source "an FBI affidavit filed in federal court."

The prosecutor notified the trial court promptly on Monday morning about the article's appearance. In response to defense counsel's query about how it happened that the article was published shortly before the case was scheduled to go to the jury, the prosecutor responded that he had inquired of an FBI agent in Newark, who had told him that "as far as they could tell there had been some kind of leak, that

the reporter had gotten hold of something that he shouldn't have gotten hold of. It was in no one's interest." The defendants moved for a mistrial and for an evidentiary hearing into the possibility of prosecutorial misconduct leading to the publicity.

The court proceeded to question each of the regular and alternate jurors individually, with counsel present, as to their awareness of and reactions to the *Daily News* article. Four jurors said they had seen the article, eight others said they had heard the article mentioned in the jury room, and two jurors said they were unaware of the article. Each juror assured the court that the incident would not affect his ability to render a fair and impartial decision. The court was satisfied that neither the jury as a whole nor any of its members had been prejudicially affected by the article, and it denied defendants' motions. It offered to give a cautionary instruction, which defense counsel declined. After trial the court adhered to its decision, denying a renewed motion by Gigante for a mistrial and a hearing. (Memorandum Decision dated June 10, 1983 ("June 10 Decision").)

## C. *The Verdicts*

The jury deliberated for four days. During its deliberations it requested a number of exhibits, transcripts of all of the tapes in evidence, the replaying of some of the tapes, and the rereading of some of the testimony. Eventually the jury found Gigante and Vodola guilty on both conspiracy counts (1 and 8), on two counts of making extortionate extensions of credit (2 and 7), and on two counts of using extortionate means to collect such extensions of credit (11 and 12). It found each defendant not guilty on counts 3, 6, and 9.

## II. DISCUSSION

On appeal Gigante contends principally that the district court should have granted a mistrial because of the adverse publicity during trial. In addition, he contends, *inter alia,* that the trial court improperly permitted the government to make references to Gigante's alleged connections to

organized crime and improperly allowed the introduction of evidence of other crimes by Gigante and other persons. Gigante also argues that he was denied a fair trial by the prosecutor's improper inquiry as to whether Sirabella still feared Gigante. We have considered all of Gigante's contentions, singly and in combination, and find in them no basis for reversal.

## A. *The Adverse Publicity*

On appeal, Gigante renews his arguments that the publicity was so prejudicial as to require a mistrial and that a hearing should have been held to determine the source of the "leak" of the information to the press. He cites as grounds for mistrial the sensational nature of the article, the references linking Gigante to organized crime and to loansharking, the timing of the article's release, the credibility of the newspaper's source, the pervasiveness of the medium, and the evidence of the jurors' exposure to the article. As to the need for a hearing, Gigante states that "the circumstances strongly suggest[ ] possible prosecutorial complicity" (Gigante brief on appeal at 25), and challenges the court's reliance on the "uncross-examined and conclusory assertion of the United States Attorney that no prosecutor had been involved." (*Id.*) We are unpersuaded.

■ The trial court has broad discretion in determining whether prejudice requiring the grant of a mistrial has resulted from publicity during a trial. *United States v. Persico*, 425 F.2d 1375, 1382 (2d Cir.), *cert. denied*, 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970). Each case must turn on its own facts, and the essential question is whether the jurors retained the requisite impartiality. *Id.* The trial judge is in the best position to make such an evaluation. In a case in which (1) the publicity does not focus directly on the issue of the defendant's guilt or innocence with respect to the charges in the ongoing trial, (2) much of the potentially prejudicial matter has been adduced as competent evidence at trial, (3) the trial judge has taken prompt action to determine the effect of

the publicity on the jurors, and (4) the judge has given or offered to give cautionary instructions, we will rarely second-guess his assessment that the jury's impartiality was not prejudicially affected by the publicity.

■ In the present case the trial judge was satisfied at trial that none of the jurors was prejudicially affected by the *Daily News* article, and we see no basis in the record to disturb his conclusion. The court promptly questioned each juror and received answers it considered to be "straightforward" (Trial Transcript at 1561), "candid[ ] and forthright[ ]" (June 10 Decision at 2), and that showed the jurors were "fully aware of their responsibilities and obligations," *id.* The court's conclusion that the jurors were not prejudicially affected was based in part on the jurors' responses and in part on the court's own view of the likely effect of the article. The court took into account the facts that the article dealt with an investigation unrelated to the present case (a view also expressed by one of the jurors), that the lengthy article's mentions of Gigante were brief, and that the jury had already heard considerable evidence to the effect that Gigante was a member of organized crime and was prone to violence.

In denying Gigante's posttrial motion relating to the publicity, the court found confirmation for its earlier views in the conduct and outcome of the jury's deliberations. The jury deliberated for four days, and during that time it asked to review selected exhibits, tapes, and portions of testimony. It proceeded to reach verdicts of guilty on some counts and not guilty on other counts, indicating that the jurors had in fact, as they had indicated they would, approached their task "responsibly, objectively and conscientiously." *Id.* at 5. In all the circumstances we see no abuse of discretion in the district court's denial of the motions for a mistrial.

■ Nor is there any merit in Gigante's contention that the district court should have held a hearing as to whether the

publicity was attributable to prosecutorial misconduct. The district court relied not only on the letter of the United States Attorney of May 13, 1983, but also on the June 3, 1983 affidavit of the Executive Assistant United States Attorney reporting on her investigation of the events leading to the disclosure. These documents provided an adequate basis for the court to conclude that the office responsible for the present prosecution played no role whatever in the misfiling of the FBI affidavit that apparently was read by the *Daily News* reporter and used as the basis for the article. Gigante has made no showing of prosecutorial misconduct, and no hearing was required.

### B. *Evidentiary Contentions*

■ Gigante's principal claims of error in evidentiary rulings are that the court improperly allowed the prosecutor to make references to Gigante's alleged ties to organized crime and that it improperly allowed a variety of "other crimes" evidence. We are unpersuaded.[2]

### 1. *References to Organized Crime*

■ Gigante contends in general and in two specific instances that he was prejudiced by the government's references at trial to Gigante's alleged ties to organized crime. He claims that immediately after a side-bar conference, during which he asserts that the trial court limited the admissibility of references to organized crime, the prosecutor deliberately asked the following "leading and loaded question" (Gigante Brief on appeal at 31): "Now did there come a time when you met this loanshark connected to organized crime, Mario?" Gigante's attorney objected to the form of the question, the objection was sustained, and the prosecutor rephrased the question

to omit the term "loanshark" and the reference to organized crime. On the following day the court instructed the jury that evidence that Vodola had told Sirabella that certain persons were members of organized crime was received in evidence not to prove that those persons were in fact members of organized crime but only to show (a) Vodola's intent in his dealings with Sirabella and (b) Sirabella's state of mind. This instruction was plainly correct.

■ Section 892(b)(3), concerning the making of extortionate extensions of credit, specifically contemplates that the trial court may admit evidence that "[a]t the time the extension of credit was made, the debtor reasonably believed" either (1) that his creditor had collected or attempted to collect extensions of credit by extortionate means or had punished nonpayment by extortionate means, or (2) that the creditor had a reputation for using extortionate means to collect extensions of credit or to punish nonpayment. Evidence that the debtor believed the loanshark was connected to organized crime is admissible to show the debtor's belief that the loanshark would use, or had a reputation for using, extortionate means to collect extensions of credit. *E.g., United States v. Ochs*, 595 F.2d 1247, 1260 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979); *United States v. Zito*, 467 F.2d 1401, 1405 (2d Cir.1972).

■ Given the court's proper instruction as to the purpose for which the organized crime references could be used, and given the context of the question to Sirabella, we see no prejudice to Gigante from such references. The form of the question was successfully challenged. The substance of the question was closely related to the prior—unobjected to—testimony of Sirabella to the effect that Vodola had

---

**2.** Nor do we find any error in the district court's admission of the expert testimony of FBI Agent Sponholtz that on February 1, 1981, Vodola dialed the digits of Gigante's phone number, which was based on a comparison of the amount of time required for return of the dial after each digit was dialed as recorded on tape on that date with the time required upon Spon-

holtz's subsequent test of the same phone. The trial judge is accorded broad discretion in the admission of expert testimony, *Hamling v. United States*, 418 U.S. 87, 108, 94 S.Ct. 2887, 2903, 41 L.Ed.2d 590 (1974), and in this case it was not abused. The expert was well qualified and his test appears to have been accurate.

told him that a man named Mario who was connected to organized crime would lend Sirabella money. The record does not support Gigante's contention that the substance of such a question had been barred by the court during the side-bar conference. And any possible adverse effect from the improper form of the stricken question was dispelled by the court's curative instruction.

Nor do we find any merit in Gigante's contention that the prosecutor's summation was unfairly prejudicial because it referred to Sirabella's "knowledge" that Gigante was connected to organized crime, and thus suggested that Gigante was in fact a member of organized crime, rather than referring more properly to Sirabella's belief or state of mind. The trial court found that, given its limiting instruction on use of references to organized crime, the jury would understand that the prosecutor was referring to Sirabella's state of mind. Having reviewed the court's instructions and the prosecutor's remarks in context, we conclude that the trial court's evaluation was not incorrect and that no error occurred.

### 2. *"Other Crimes"*

■ Gigante challenges the trial court's decision to allow the jury to hear evidence of his gambling operation and his extortionate extensions of credit to persons other than Sirabella, and evidence of crimes committed by persons other than Gigante. Gigante did not object to any of this evidence at trial, and his present contentions have thus been waived. *United States v. Braunig,* 553 F.2d 777, 780 (2d Cir.), *cert. denied,* 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 277 (1977). In any event we find his contentions meritless.

■ The evidence that Gigante made extensions of credit to persons other than Sirabella was properly admitted to show, *inter alia,* the scope of the conspiracies charged in the indictment, *United States v. Barnes,* 604 F.2d 121, 166–67 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980), and to show the reasonableness of Sirabella's fear of Gi-

gante which was induced by Vodola's descriptions of how other delinquent debtors had been dealt with by Gigante.

■ The evidence that Gigante operated a gambling establishment was relevant as background information to explain the extension of credit charged in count 3 of the indictment and the collection of that extension of credit by threats as charged in count 9; both counts related to an alleged gambling debt of Sirabella to Gigante. Evidence of the gambling operation thus was properly admitted. *E.g., United States v. Shulman,* 624 F.2d 384, 391 (2d Cir.1980); *United States v. Carino,* 417 F.2d 117, 119 (2d Cir.1969). The fact that the jury acquitted Gigante on three counts, including counts 3 and 9, suggests that, in any event, Gigante was not prejudiced by the admission of the evidence.

■ The evidence that Sirabella had been beaten by other loansharks was admissible as background to show how Gigante came to consolidate all of Sirabella's loans. Defendants did not object to this testimony but merely requested an instruction that the evidence of the beating was not offered to show that Gigante was responsible for it. The court gave such an instruction, and Gigante has no basis for a claim of error.

■ The evidence that someone had broken into Sirabella's apartment was also properly admitted. Defendants had announced that they would introduce into evidence post-break-in recordings of Vodola's conversations with Sirabella as exculpatory evidence because the tapes revealed Vodola's friendliness toward Sirabella. The trial court did not abuse its discretion in allowing evidence of the break-in, together with the circumstantial evidence from which the jury could have inferred that Gigante was involved, in order to allow the jury to assess defendants' theory.

### C. *Prosecutor's Improper Question*

■ Gigante complains that he was prejudiced by the prosecutor's improper questioning of Sirabella. At the very end

of Sirabella's direct testimony, the prosecutor asked Sirabella, "Mr. Sirabella, as you sit there today, are you still afraid?" The defense objection was sustained. Sirabella nevertheless answered in the affirmative; his answer was stricken, and the jury was promptly cautioned that it must disregard that question and answer. Although we agree that the question at issue was improper, we conclude that it does not warrant a reversal.

The statute under which Gigante was prosecuted makes relevant a debtor's state of mind at the time the extension of credit was made and at the time a collection or an attempt at collection was made. 18 U.S.C. §§ 892(c), 894(c). Neither section makes relevant the debtor's state of mind at the time of trial. While evidence of a person's state of mind at a particular time may be admitted to show his state of mind at an earlier time if it is reasonable to assume a continuity between the two times, *see, e.g.,* C. McCormick, *Handbook of the Law of Evidence* § 294, at 696 (2d ed. 1972), it is within the trial court's discretion to assess in that light the probative value of the proffered evidence, *id.; see* Fed.R.Evid. 403. Here the trial court excluded the evidence as improper, an assessment that appears correct in light of the more than two-year hiatus between the trial and Sirabella's last encounter with the defendants.

In all the circumstances, however, we conclude that the impropriety does not warrant reversal. The court struck the witness's answer and immediately gave an appropriate curative instruction. Given these prompt corrective measures and the previously received proper evidence of Sirabella's fears during his dealings with Gigante and of the threats and violence that had been directed against him by Gigante, the jury was unlikely to have been influenced by the prosecutor's improper question.

## CONCLUSION

The judgment of conviction is affirmed. The mandate shall issue forthwith.