UNITED STATES of America

v.

Khaled Mohammed EL–JASSEM, Defendant.

No. CR 73–500(JBW).

United States District Court, E.D. New York.

April 20, 1993.

William M. Kunstler and Ronald L. Kuby, New York City, for defendant.

### AMENDED MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge:

TABLE OF CONTENTS

I.  FACTS ...................... 170
II.  JURY ....................... 171
    A.  Selection ................. 171
    B.  Additional Voir Dire ....172
    C.  Sequestration ........... 172
III.  EVIDENCE ................. 174
    A.  Handwriting ............. 174
    B.  Fingerprints............. 174
    C.  Explosives .............. 175
IV.  POST–VERDICT PROCE-
    DURES .................... 175
V.  CONTENTIONS OF THE
    DEFENDANT .............. 175
VI.  LAW ....................... 175
    A.  Publicity ................. 175
    B.  Sequestration ........... 177
    C.  Continuance ........... 177
    D.  Lack of Extradition
        Limits on Court's
        Power ................. 177
VII.  APPLICATION OF LAW
    TO FACTS ................ 177
    A.  Fairness of Jury and
        Trial ................... 178
    B.  Fairness of Court ....... 180
VIII.  SENTENCING CONSID-
    ERATIONS ................ 180
    A.  Generally ............... 180
    B.  Affiliation With Ter-
        rorist Organizations ....181
    C.  1979 Arrest in Germa-
        ny for Terrorist Ac-
        tivities ................. 181
    D.  Effect on Family........ 181
    E.  Limits Imposed by
        Italian Authorities ....181
IX.  SPECIFIC SENTENCE ....... 182
    A.  Consecutive Sentences ....182
    B.  Prison ................... 182
    C.  Time Credited From
        Arrest in Italy ......... 182
    D.  Fine .................... 182
X.  CONCLUSION ............... 183

Defendant was found guilty by a jury of attempting to explode three powerful car bombs—one at 43rd Street and Fifth Avenue, one at 47th Street and Fifth Avenue and one at John F. Kennedy Airport. His motion

Mary Jo White, U.S. Atty., Brooklyn, NY by Charles E. Rose, for the U.S.

for a judgment of acquittal for lack of evidence or for a new trial on the grounds that his trial was unfair are meritless. To incapacitate defendant and to deter others from committing similar serious crimes the defendant is sentenced to the statutory maximum—thirty years in prison and a fine of $30,000.

## I. FACTS

On March 5, 1973 a New York City tow truck operator impounded an illegally parked car on the corner of 43rd Street and Fifth Avenue. The following morning, another car was towed from the corner of 47th Street and Fifth Avenue. Each had a newspaper with Hebrew lettering on the dashboard. That same day a rental car company official claimed one of the cars at the impound lot. Upon opening the trunk he discovered large plastic containers filled with gasoline, a charged propane tank, high explosives, a blasting cap, a timing device and a battery—all connected with wires and set to explode.

The bomb squad was called to dismantle the device. A search of the pound revealed an identical bomb in the second car. Later that night, a third car with a similar newspaper on the dashboard was discovered parked outside the El Al Airlines cargo-passenger terminal at John F. Kennedy Airport; the bomb squad found an explosive device identical to the two from midtown Manhattan except that it was twice as powerful.

The terrorist organization, Black September, whose flyers were found in each of the three cars, claimed responsibility for the bombs. The immediate intended targets in addition to El Al Airlines, the national airline of Israel, were the Israel Discount Bank at 43rd Street and Fifth Avenue, and the First Israeli Bank and Trust at 47th Street and Fifth Avenue.

A defect in all three bombs prevented the explosions. The FBI reconstructed one of the bombs and placed it in the trunk of a car in a large open field. A sound recording and video picture of the detonation revealed an enormous concussion, a huge fire ball more than a hundred feet in diameter, a demolished car and many small pieces of metal propelled at high speed far from the scene of the explosion. These bombs would have seriously damaged buildings and vehicles in the area. Depending on when they went off, they could have killed and maimed hundreds, caused large fires and terrorized thousands of people. The video was not shown to the jury since it was extremely disturbing to viewers and was not essential to the case the government was presenting.

All three cars had been rented by a person calling himself Yusif Aid Shahein. The three cars were searched and their contents seized. Latent fingerprints were lifted from a part of one of the bombs, from the trunk of one car, from a map in one glove compartment and from Palestinian Liberation Organization ("PLO") and Black September propaganda folded within the newspapers within the cars.

Within a week, the FBI focused on an individual named Khalid Al–Jawary, who had entered the United States two months earlier. He had stayed at a midtown Manhattan hotel and at two hotels in New Jersey. He had rented a series of cars from a car rental agency and had applied for flight instruction at the Teterboro School of Aeronautics. At one point Al–Jawary wired abroad for additional money. He received $1500 from Beirut, Lebanon and converted it into travelers cheques. On March 3, Al–Jawary had checked into the Skyway Hotel at Kennedy Airport, across the street from the El Al terminal. On March 4, he had telephoned a woman he had met in New Jersey to inform her that he had to leave the United States unexpectedly. He was not seen here again for seventeen years.

Sixty fingerprints from twenty-seven items, handwriting on twenty-two documents, hidden papers and parts of bomb materials were found in rooms occupied by Al–Jawary or Shahein. There was no doubt that the two names were used by one person who was responsible for the three bombs.

In 1973 Al–Jawary was indicted for the airport bomb in the Eastern District of New York and for the two Fifth Avenue bombs in the Southern District of New York. The defendant moved to consolidate these two indictments for trial in the Eastern District

of New York after the defendant was apprehended and brought before this court.

In January 1990 the FBI agent assigned to the case notified the Italian national police that a person named Khaled Mohammed El–Jassem was passing through Leonardo Da Vinci International Airport in Fiumicino, Italy. He was a PLO employee living in Cyprus and believed to be involved in smuggling explosives in Europe. The FBI requested the Italian authorities to hold the defendant based upon a comparison of his fingerprints with those of Al–Jawary–Shehein. The prints matched.

The United States sought extradition of the defendant to stand trial for the attempted 1973 bombings. The Italian treaty provides that, for extradition purposes, the crime charged must be a felony carrying a penalty of more than one year; in the event of a crime where the death penalty might be imposed, the United States must assure the Italian government that it will not impose death. One of the grounds raised by defendant in opposition to his extradition was that the crime for which he was charged carried the death penalty. In its decision the Rome Appeal Court rejected this contention, addressing the penalty that might be imposed as follows:

> [We] have other conditions; the extradition Treaty with the United States requires:
>
> &ast;    &ast;    &ast;    &ast;    &ast;    &ast;
>
> b. The crimes are punishable ... with a restrictive sentence of more than at most one year imprisonment, in particular for the crimes here examined is provided in Title 18 of the Federal Code, Sec. 844(i) the maximum sentence is imprisonment up to ten years and a fine of $10,000, or both. Therefore, in the aims of extradition, we notice the heavier punishment.
>
> c. the crime for which we have the request for extradition does not provide [a] death penalty (this is contrary to the unfounded assumption posed by the Defense).

Op. of Rome Appeal Court at 10. The Italian court was aware that defendant had been charged in both the Southern and Eastern Districts, for a total of three attempted bombings. *Id.* at 7.

After the Italian court granted extradition, defendant was turned over to the FBI in Rome and flown to Stewart Airport in New York. The agency then took "major case" fingerprints of defendant—prints of essentially the entire hand. The FBI crime laboratory reevaluated all the prints it had gathered in 1973 against the new fingerprints of defendant. Al–Jawary, Shahein and the defendant, El–Jassem, were confirmed as being the same person.

Defendant was arrested in Italy in January, 1991 and brought to the United States in April, 1992. Trial was first scheduled for September, 1992, but was adjourned three times at defendant's request, first to November 23, 1992, then to January 26, 1993, and finally to March 4, 1993. The government was prepared for trial each time, and opposed each adjournment because of the difficulty in assembling the many witnesses. The week before trial El–Jassem requested another adjournment, this time to conduct a competency examination. The competency examination was administered promptly and no adjournment was necessary. The trial would have been completed long before the World Trade Center bombing—in February of this year—had it not been for defendant's repeated requests for delay.

The only significant question at trial was whether the fingerprints left by the bomber in 1973 in the United States were those of the defendant. It was the position of his counsel that the FBI had "framed" defendant by putting his fingerprints on a part of one bomb and on other objects and relevant documents.

## II. JURY

### A. *Selection*

With consent of the parties jury selection took place on February 24, 1993 before a Magistrate Judge. The trial was scheduled to begin on March 4. Initially every prospective juror was questioned at the sidebar. The parties later agreed that it would be satisfactory to conduct the interviews in groups of four. In addition to the routine

questions concerning pedigree and bias, special *voir dire* questions were asked and answered based upon defendant's submissions.

Each venireperson was asked whether he or she had any connections with, any views about or made any financial contributions to the State of Israel and whether he or she had views about or was actively involved in advocating or supporting a separate state for Palestinians. The defense attorneys were permitted to question the panel directly. Only one of the defendant's challenges for cause was denied. Once twelve jurors were selected, the court announced, "This is our jury," to which defense counsel responded without objection, "This is our jury." The parties agreed that twelve additional venirepersons be questioned simultaneously in order to select six alternates. Once the entire panel of eighteen was agreed upon, the Magistrate Judge directed the members of the jury and alternates to refrain from watching television, listening to the radio or reading about the case.

### B. *Additional Voir Dire*

Two days after the jury was selected and six days before the start of trial, on February 26, 1993, the World Trade Center was bombed. Because of the intense publicity surrounding the bombing, on March 2, the defendant moved for a continuance until the publicity had a chance to subside. The motion was denied with leave to renew after requestioning of the jurors.

To fully protect the defendant, on March 4, the court questioned each member of the jury panel individually to ascertain whether the events at the World Trade Center would possibly affect in any way his or her ability to be absolutely fair and impartial and to decide the case solely on the evidence adduced at trial and the law provided by the court. The court first asked the jury and alternates sitting together if any of them had heard about the bombing of the World Trade Center. They all had. None of them reported having heard or read anything about the defendant or the case since being selected.

The court then asked each juror to reflect alone to make certain that the events at the World Trade Center would have no effect on a decision in the case. They retired to the jury room to individually think about the matter. Each juror and alternate was invited alone into the courtroom and asked individually whether he or she could be absolutely fair and impartial in the case. Each responded in the affirmative. When defense counsel asked for further inquiry, it was conducted.

One juror volunteered that he had inadvertently seen a fifteen-second news clip about the case going to trial in which he had seen pictures of the banks involved. He was questioned at length about what he had seen and whether it would affect his ability to be fair and impartial. His answer was firm: he would not be affected. The court was satisfied that he was a stable, honest and truthful juror and did not discharge him. The court agreed, however, to reconsider the matter if so requested. No such request was made.

The court concluded that no member of the jury would be influenced by the World Trade Center bombing. It was confirmed in that view not only by the juror's responses and demeanor but by the simple factual issue at trial—were the fingerprints of defendant left by him on the artifacts of the crime twenty years ago.

Accordingly, the jurors and alternates, were sworn. The trial began, as scheduled, on the morning of Friday, March 4.

### C. *Sequestration*

A few hours into the trial, while the jury was in the courtroom, the court was informed by note that the FBI was about to hold a press conference revealing some of those it believed responsible for the World Trade Center incident. The names mentioned suggested a possible Middle East connection in that case and the danger that other names could surface which might prejudice the defendant. The court immediately arranged to have the jury sequestered.

Defendant's senior counsel urged that the arrest of a Middle Eastern suspect and his link to one of counsel's former clients made a fair trial impossible. Counsel's argument could not be credited. Since the jury was unaware of these developments, it could not

be affected by them. Moreover, postponing trial would, in fact, present problems absent from the trial in progress and might lead to indefinite delay. The present jurors were totally ignorant of the World Trade Center bombing suspects, their names or linkage to defense counsel. Any future jurors might well be aware of all these matters.

There were several other reasons for denying defendant's motion to abort the trial. In the first place, the present jurors had been selected before the bombing so that they could have had no reason to be less than candid on the original *voir dire* because of that subsequent event—that is, to want to be on this jury or avoid service on this jury because of the World Trade Center bombing. Any jury, even one chosen years from now, might be subject to the suspicion of lack of candor on the *voir dire* in view of developments in the World Trade Center investigation of which the present jury knew nothing.

In the second place, this was an exceptionally mature and diverse jury. Eight were women and four were men. Six were caucasian and six were Afro–American. Two of the six caucasians were hispanic. They ranged widely in age. They were responsible members of the community including a registered nurse, an IRS account adjuster, a bank customer service representative, an insurance company clerk, an investigator's assistant, a computer program planner, a textbook audit clerk, a retired maintenance worker, a retired laborer, a retired exterminator and two homemakers. The court was convinced by their demeanor and attitude that they would decide this case without regard to any extraneous event.

In the third place, the only issue was identity, and that would be established by objective, non-emotional fingerprint and handwriting evidence, not by any eyewitness identification.

In the fourth place, the court and parties, by stipulation, would take any potentially emotional evidence out of the case. For example, the force of the bombs was not demonstrated, Black September or PLO was not named, terrorism or motive was not mentioned, and the propaganda leaflets in the three cars were not shown to the jury.

The jury was informed that it would be sequestered. One juror was excused to enable him to honor an important, unbreakable weekend commitment. The court decided that the trial would continue on Saturday and Sunday to limit the number of days the jury would have to be sequestered. A strict sequestration order ensured that the jury would not receive any news about the arrests made in connection with the World Trade Center bombing.

On the second day of trial one juror, whose husband reportedly had threatened to "put her four children in a foster home," was excused. The juror's husband had personally telephoned senior defense counsel about the matter. Counsel attributed the juror's sudden inability to serve to the sequestration order and moved to end the sequestration. In denying the motion, the court explained:

> We have information on TV, radio and in the press that there are Middle East terrorists connected with the bombing [of the World Trade Center]. The names and religions may be connected with the defendant, and cause an unfair trial.
>
> ... We'll not for a long, long time get a jury as good as this one and as fair and impartial. The jury was chosen before the event at Twin Towers. Nobody tried to get off or tried to get on as a result of that incident. They've been kept secure so that they haven't gotten this information. Any jury ... in the future will have all of this information. We now have a very fine jury and sequestration is the only way I can keep them in the present advantageous position.

Tr. at 195–96.

The remaining jurors were comfortable with sequestration. Their quarters and dining were entirely satisfactory. Their needs were fully attended to by solicitous male and female marshals. They were escorted to church services on Sunday. The court observed them to be relaxed at all times, bonded to each other and appearing to rather enjoy the experience. Moreover, the trial ended on Monday, less than four days after it had begun, so that inconvenience was minimized. The court explained to the jury that

the number of witnesses and their scattered locations would provide for a more efficient trial were there sequestration. This explanation was accurate, though disingenuous since, alone, it would not have led the court to order sequestration.

No juror was influenced by the World Trade Center bombing. No juror was aware of any investigative development in the case after the trial started.

## III.  EVIDENCE

The work of the FBI was methodical and careful. Its institutional memory was faultless. Its tenacity was impressive.

As indicated below, one agent's mistake in failing to send one set of the many fingerprints to Washington in 1973 was the ground for defendant's claim of "frame-up." The jury was not impressed by this baseless charge. Evidence of guilt was overwhelming. The case was tried quickly since the key evidence was scientific and was not contested. Twenty-six prosecution witnesses testified—primarily as to identification of items of real proof. As indicative of the detailed evidence the government offered, one of the exhibits found in the hotel room where Al–Jawary stayed was the minute hand of the clock that was used as part of the timing device on one of the bombs. In the airport hotel, some months after the attempted bombings, a worker found the passport and international driver's license connected with Shahein secreted behind an air conditioning unit in the room Al–Jawary occupied just before he left the country.

### A.  Handwriting

Several documents signed by Khalid Al–Jawary and Yusif Aid Shahein during Al–Jawary's stay in New York and New Jersey were analyzed. These included the car rental agreements, hotel registration cards, hotel restaurant receipts and travelers cheques. There was also an endorsed refund check from the Teterboro School of Aeronautics, three postcards written by Khalid Al–Jawary from Italy, Lebanon and France to a woman in New Jersey and the Black September flyers found in each of the rental cars involved in the attempted bombings. Twenty-two handwriting samples were analyzed.

Retired FBI agent Fred Woodcock, a document examiner with more than thirty years of experience, explained the principles applied and methods utilized in conducting handwriting analysis for comparison of documents. Without contradiction, he concluded unequivocally that all the handwriting samples were written by the same person.

### B.  Fingerprints

Sixty latent fingerprints were lifted from a total of twenty-seven items. For each latent print developed in 1973 there was a photograph of the print that preserved it over time. Some prints came from the three cars, on such objects as the newspapers, Black September flyers, a map, the trunk of one car, car rental documents and a propane tank. Other prints came from objects in the hotels where Khalid Al–Jawary had stayed, such as a lamp, a television tuning knob and hotel reservation and restaurant receipts. Still others were associated with Al–Jawary's stay in the New York Metropolitan area including travelers cheques, the refund check from the Teterboro School of Aeronautics and a travel services card listing fares to Beirut and Paris.

Agent Clarence Phillips, a 36–year veteran of the FBI, who currently manages fingerprint training programs at the FBI academy, had analyzed the fingerprints in 1973 while he was assigned to the FBI latent fingerprint section in Washington, D.C. Using a photographic enlargement of one of the latent prints found on an Avis map that was in one of the cars, he explained to the jury the principles of fingerprints and their analysis. The latent prints taken in 1973, belonging to Khalid Al–Jawary, were compared with the major case fingerprints taken of Khaled Mohammed El–Jassem, the defendant, after his extradition in 1991. Without contradiction, Agent Phillips concluded that all the fingerprints matched.

At the trial defendant contended that the FBI plotted to place his fingerprints on one propane tank. This theory, he argued, was supported by the belated discovery of those prints in October 1992, in an FBI file. The

latent prints from the tank had been taken off the tank in 1973, but had not been sent to the FBI crime laboratory in 1973 because, as the agents involved testified, of a failure on the part of one of the agents not assigned to the squad investigating the case to realize that he was to have sent them on to Washington. Agent Phillips testified that there was no way to remove latent fingerprints from the card where they had been preserved or from any other source and place them on the tank. There were still, twenty years after the event, traces of the latent fingerprints on the tank.

### C. *Explosives*

Sergeant Terrence G. McTigue, a 25-year veteran of the New York City Police Department Bomb Squad, described how the three bombs had been assembled and how he had disarmed one of them. The defendant's objection to the sergeant's offer to explain why the devices did not detonate was sustained.

FBI agent Fred Whitehurst, Dean of the FBI Explosives Analysis School, described the quantitative and qualitative analysis he performed in 1992 on the explosive materials found in the three cars. He used sophisticated scientific techniques including liquid chromatography, mass spectrometry and optical microscopy. He concluded that the primary explosive material in all three cars were Semtex high explosive, likely originating from the same source. The defendant stipulated that, had the bombs exploded, they would have caused substantial damage to their intended targets.

## IV. POST–VERDICT PROCEDURES

To assist the defendant in preparing for sentence, the court issued a post-verdict order on March 9, 1993. It required, *inter alia*, that 1) the United States Attorney and Probation assist the defendant in obtaining documents from abroad relevant to his sentence; 2) Probation furnish the defendant with a copy of the presentence report in English and Arabic translation; 3) the defendant be sentenced twenty days after the Arabic translation was presented to him; and 4) he be granted at least ten days to respond to adverse information in the presentence report.

## V. CONTENTIONS OF THE DEFENDANT

Defendant moves for a judgment of acquittal or, in the alternative, to set aside the guilty verdict and be granted a new trial pursuant to Federal Rule of Criminal Procedure 29(c) and the Fifth and Sixth amendments to the Constitution. He also moves to limit the court's sentencing discretion. His grounds, in addition to "frameup" and thus inadequacy of proof, are that 1) the publicity surrounding the bombing of the World Trade Tower made it impossible for him to obtain a fair trial; 2) the jury when it was initially empaneled was never questioned on any aspect related to the World Trade Center bombing; 3) the court's *voir dire* of the jury regarding the World Trade Center bombing was perfunctory and inadequate; 4) the jury was never questioned about the possible effect of sequestration on its members; 5) the combined effect of the bombing and sequestration resulted in a swift verdict that was inconsistent with a reasonable view of how the deliberations might proceed; 6) the haste with which the trial was conducted stemmed from the court ordered sequestration; 7) the court's determination to expedite the sentence denied defense counsel adequate time to obtain letters and witnesses on defendant's behalf and indicates that the court, like the jury that convicted the defendant, is influenced by the impact of the World Trade Center bombing in imposing sentence; 8) the Italian government's action in releasing defendant to the FBI limited this court's power to impose a maximum sentence to ten years; and 9) the fact that the judge had been threatened in connection with other cases made it impossible for him to try or sentence defendant fairly.

## VI. LAW

### A. *Publicity*

It is not uncommon for a notorious trial held in the New York Metropolitan area to garner extensive publicity. The availability of modern communications technology in an international communications center, the

need of media managers for a constant flow of news and the interests of the public in criminal trials, lead to extended television, radio and print coverage of many trials. *See Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). *See also United States v. Rosado*, 728 F.2d 89, 94 (2d Cir.1984) (trial court cannot be faulted for failing to impanel a jury completely unfamiliar with highly publicized terrorist organization).

■ Where jurors' views have been affected by publicity harmful to the defendant, a new trial should be granted. *See generally* 3 Charles A. Wright, *Federal Practice and Procedure* § 554 (2d ed. 1982). But, "the mere existence of such publicity does not require a new trial if the court determines that the defendant was not prejudiced by it." *Id.* at 254–55. "Due process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982) (no denial of due process where juror's application to be an investigator for the District Attorney's office, made during trial, was withheld from the trial court).

■ In *United States v. Lord*, 565 F.2d 831 (2d Cir.1977), the Second Circuit established a three-step process for the district court to follow in determining whether extensive publicity may have a prejudicial impact on a criminal trial. The court must 1) determine whether the coverage has the potential for unfair prejudice; 2) canvass the jury to ascertain whether it has been exposed to the publicity; and 3) individually examine each juror, outside the presence of the others, to determine what they have learned and what effect, if any, it will have on their ability to be impartial. *Id.* at 838.

■ The determination of whether the jurors remain impartial depends upon the special facts of each case. *United States v. Gaggi*, 811 F.2d 47, 51 (2d Cir.), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987). *See, e.g., United States v. Gigante*, 729 F.2d 78, 82 (2d Cir.), *cert. denied*, 467 U.S. 1206, 104 S.Ct. 2390, 81 L.Ed.2d 348 (1984) (denying mistrial where lengthy news

article featuring picture of defendant described as "alleged Genovese capo" was seen by four jurors who said they would not be affected); *United States v. Persico*, 425 F.2d 1375, 1382 (2d Cir.), *cert. denied sub nom. McIntosh v. United States*, 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970) (denying mistrial where the prejudicial matter was "easily isolated" and proper corrective procedures were used to ensure the jury based its verdict solely on the evidence before it).

■ The trial judge has broad discretion in deciding whether prejudice results from publicity. *United States v. Moon*, 718 F.2d 1210, 1219 (2d Cir.1983), *cert. denied*, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984) (upholding trial judge's assessment that selected jury "if not totally free from bias, [was] by and large capable of putting aside the bias they [had]"). *See also United States v. Persico*, 425 F.2d 1375, 1382 (2d Cir.), *cert. denied sub nom. McIntosh v. United States*, 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970) (trial judge is "in the best position to make [the] difficult evaluation" of whether jurors remained impartial).

■ Adverse publicity, without more, is not necessarily prejudicial. The crucial issue is whether the jurors retain the requisite impartiality in the face of such publicity. *United States v. Persico, supra*, 425 F.2d at 1382. "It is the impartiality of the jurors— not the quantum of publicity—that determines whether the trial proceedings may be fairly conducted." *United States v. Gaggi*, 811 F.2d 47, 52 (2d Cir.), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987). *See also Dobbert v. Florida*, 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977) (new trial denied where petitioner's argument "rest[ed] almost entirely upon the quantum of publicity which the events received," not to any "specific portions of the ... *voir dire* examination of the jurors").

■ Even where adverse publicity speaks directly to the character or possible guilt of the accused, courts have properly refused to grant a new trial if the trial judge concludes that no prejudice resulted. *See, e.g., United States v. Gigante*, 729 F.2d 78, 82 (2d Cir.), *cert. denied*, 467 U.S. 1206, 104 S.Ct. 2390, 81

L.Ed.2d 348 (1984); *United States v. Alley,* 661 F.2d 718, 721 (8th Cir.1981) (reference to codefendant's guilty plea); *United States v. Berry,* 627 F.2d 193 (9th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 843 (1981) (reference to defendant as "disbarred attorney"); *United States v. Ricardo,* 619 F.2d 1124, 1131 (5th Cir.), *cert. denied,* 449 U.S. 1063, 101 S.Ct. 789, 66 L.Ed.2d 607 (1980) ("inordinate amount of publicity" regarding conviction of defendant at former trial); *United States v. Lord,* 565 F.2d 831 (2d Cir.1977) (news articles about trial containing incriminating and prejudicial information not in evidence); *United States v. Barrett,* 505 F.2d 1091 (7th Cir.1974), *cert. denied,* 421 U.S. 964, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975) (newspaper article about government's investigation of defendants' actions appeared between jury selection and beginning of trial); *United States v. Feldman,* 299 F.2d 914 (2d Cir.), *cert. denied,* 370 U.S. 910, 82 S.Ct. 1256, 8 L.Ed.2d 403 (1962) (where ten jurors read news article about trial and about codefendants entering a guilty plea).

### B. *Sequestration*

██ Courts have long been mindful of the need to protect the integrity of criminal trials against outside influences. *See United States v. Borelli,* 336 F.2d 376, 392 (2d Cir. 1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). "[T]rial judges must have wide discretion in . . . protecting their processes from outside influence." *United States v. Scarfo,* 850 F.2d 1015, 1024 (3d Cir.), *cert. denied,* 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988). An extraordinary measure such as sequestration is often necessary to protect the integrity of the criminal proceeding and to ensure an impartial jury. *See, e.g., United States v. Tutino,* 883 F.2d 1125 (2d Cir.1989) (anonymous juries); *United States v. Thomas,* 757 F.2d 1359 (2d Cir.), *cert. denied,* 474 U.S. 819, 106 S.Ct. 66, 67, 88 L.Ed.2d 54 (1985) (same).

██ The decision whether to sequester the jury is discretionary with the trial court. *See, e.g., United States v. Salerno,* 868 F.2d 524, 540 (2d Cir.), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 700 (1989);

*United States v. Persico,* 832 F.2d 705, 718 (2d Cir.1987), *cert. denied sub nom. Russo v. United States,* 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988); *United States v. Porcaro,* 648 F.2d 753, 755 (1st Cir.1981); 2 Charles A. Wright, *Federal Practice and Procedure* § 389 (2d ed. 1982). In deciding to sequester the jury the court may consider whether the amount of publicity and media attention expected during the trial will affect the jury's ability to be fair. *Cf., United States v. Tutino,* 883 F.2d 1125, 1132 (2d Cir.1989) (need to protect jury from media proper basis for anonymity order).

██ Sequestration may at times be the only means available to the judge to protect the integrity of the trial process. *See United States v. Shiomos,* 864 F.2d 16, 18 (3d Cir. 1988) (upholding *sua sponte* sequestration order, observing that "the trial court has a responsibility to the public as well as to the defendant to maintain the integrity of the criminal process."). Should the judge decide to sequester the jury, the jurors should receive a neutral instruction from the court to prevent any negative inference being drawn from the sequestration order. *See, e.g., United States v. Tutino,* 883 F.2d 1125, 1133 (2d Cir.1989); *United States v. Barnes,* 604 F.2d 121, 137 (2d Cir.), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980).

### C. *Continuance*

██ The decision whether to grant a continuance that is requested because of pretrial publicity is a matter within the discretion of the trial court. *United States v. Romero,* 897 F.2d 47, 53 (2d Cir.), *cert. denied,* 497 U.S. 1010, 110 S.Ct. 3253, 111 L.Ed.2d 762 (1990) (approving trial court's refusal to grant continuance in light of publicity of recent drug-related murder of federal agent where district court took measures to ensure impartiality). A continuance is appropriate "only where it would significantly reduce the effect of publicity and warrant compromising the public interest in prompt disposition of criminal charges." *Id.* As with the motion for a new trial, the central issue is whether the jurors have such fixed opinions that they are unable to judge the guilt of the defendant impartially. *Id.* The

trial court's decision can be overturned only by a showing of clear abuse. *United States v. Romero*, 897 F.2d 47, 53 (2d Cir.), *cert. denied*, 497 U.S. 1010, 110 S.Ct. 3253, 111 L.Ed.2d 762 (1990).

### D. *Lack of Extradition Limits on Court's Power*

■ The principle of specialty, a doctrine based on international comity, prohibits a requesting nation from prosecuting a defendant extradited under treaty for any offense other than those for which the surrendering nation agreed to extradite. *United States v. Rauscher*, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886); *cf., Fiocconi v. Atty. Gen. of the United States*, 462 F.2d 475 (2d Cir.), *cert. denied*, 409 U.S. 1059, 93 S.Ct. 552, 34 L.Ed.2d 511 (1972) (same principle applies where no extradition treaty).

The test for whether a defendant is being tried for a "separate" offense "should not be some technical refinement of local law, but whether the extraditing country would consider the offense actually tried 'separate.'" *United States v. Paroutian*, 299 F.2d 486, 490–91 (2d Cir.1962) (no violation of principle of specialty where defendant extradited based on Southern District of New York narcotics indictment was later tried on additional narcotics charges in Eastern District of New York). *See also United States v. Rossi*, 545 F.2d 814 (2d Cir.1976), *cert. denied*, 430 U.S. 907, 97 S.Ct. 1178, 51 L.Ed.2d 584 (1977) (mere discrepancy between dates of conspiracy contained in the order of extradition and those in the indictment not a violation of the principal of specialty). "A superseding indictment which charges offenses of the same character as the crime for which the fugitive was extradited does not offend the doctrine." *United States v. Sturtz*, 648 F.Supp. 817, 819 (S.D.N.Y.1986) (involving additional counts which pled additional victims of the same scheme).

## VII. APPLICATION OF LAW TO FACTS

### A. *Fairness of Jury and Trial*

Defendant received "a fair trial in a fair tribunal." *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955).

The jury selected on February 24, 1993 was fair. The panel was selected before the World Trade Center bombing took place. There was no connection ever suggested between the defendant and that event. The court was fully satisfied that the jurors constituted an excellent sample of citizens from the Eastern District of New York—four men and eight women, including three Afro-American men and three Afro-American women and two hispanics. The composition of the jury was, in fact, favorable to senior defense counsel who has strong ties to the Afro-American community, as evidenced by the fact that one Afro-American juror's husband felt free to telephone him directly.

■ The defendant bases his request for a new trial on the mere quantum of publicity surrounding the bombing of the World Trade Center, not on any showing that the jurors failed to retain their impartiality in the intervening period between jury selection and the time of trial. The court responded promptly to protect defendant when it determined that the coverage of the World Trade Center bombing had the potential for prejudice. As required by *Lord*, it took prompt action in questioning the jurors individually and outside the presence of each other about whether they could be fair and impartial in light of the recent turn of events. The responses were clear—the World Trade Center bombing would have, and did have, no impact on the jurors' decision in the instant case.

■ The sequestration order was necessary to protect the integrity of the trial and to shield the jurors from outside influences. The order did not, as defendant contends, prejudice the jury against defendant. On the contrary, by sequestering the jury the court ensured that it was not tainted by events that unfolded concerning the arrests of suspected Middle Eastern terrorists in the World Trade Center bombing. The court's explanation that it was sequestering the jury for the sake of efficiency in light of the great many witnesses involved was neutral and was accepted by the jury. The defendant was not prejudiced in any manner.

■ Defendant's contention that the sequestration order caused the jurors to rush

their verdict is without merit. The jurors were highly responsible. They constituted a devoted jury. They thoroughly considered the matter. During deliberations they asked for the relevant documents. The swiftness with which the jury reached its verdict—three hours—was not a function of the sequestration order. Rather, it was a result of the government's overwhelming, irrefutable evidence of defendant's guilt, methodically presented by unimpeached witnesses.

▆▆▆ The contention of the defendant that the FBI plotted to place his fingerprints on the bomb is entirely unsupported and contrary to the evidence obtained in 1973. The fingerprint and the handwriting evidence proved unequivocally that the defendant was the same man who called himself Khalid Al-Jawary and Jossuf Y. Shehein in 1973. There was no evidence that the FBI's failure to analyze in 1973 the latent prints lifted from a propane tank was due to more than inadvertence.

At the time of trial, the fingerprints surrounding the making and placing of the bombs had been in the files of the FBI for twenty years and were completely integrated into a complex of contemporary FBI reports, all dated, logged and consistent with each other. Since the defendant was independently detained in Europe seventeen years after the fingerprints were discovered and lifted, photographed and logged by the FBI in 1973, it cannot rationally be contended that *this* person, *this* defendant, unknown to the FBI in 1973 and found by the FBI some seventeen years later in Europe, was framed. Such an act of retroactive fraud and fakery would require an inversion of history through a concept of reversible time (thus far known only to febrile imagination) allowing 1990 FBI agents to go back to 1973 to change many records as of 1973, (*cf.*, Alan Lightman, *Einstein's Dreams* (1993)), or a major conspiracy by scores of people to falsify records and perjure themselves. Even Stalin's minions were incapable of such a gross falsification of contemporary records. *Cf.*, Alan Hochschild, *The Secret of a Siberian River Bank*, N.Y. Times Mag., Mar. 28, 1993 at 28, 78 (contemporary documents proved that N.K.V.D had "fabricated a case"). A vast baroque paranoia could not support such theories in this case, of this FBI, in this United States, in this year, 1993. The jury was entitled to believe the documents and witnesses and apply its common sense.

The fairness of the proceedings is also underscored by favorable rulings that were made in response to a number of defendant's motions both pre-trial and during the course of the proceedings. Despite the delays associated with the assignment and withdrawal of counsel, defendant was able to have the best counsel of his choosing. His present counsel moved to be relieved in August 1992 because defendant was threatening to reveal terrorist secrets to the government. At defendant's request, after he decided not to cooperate, the court granted their motion for reinstatement. It is not conceivable that any other counsel could have more effectively conducted the defense. Notwithstanding that the case had been delayed for nearly twenty years, the court granted adjournments in the trial date to accommodate defense counsels' trial schedule. The case, which was originally set for trial in late January 1993, was postponed until March at defendant's request. Responding to concern that the defendant might be mentally incompetent, the court ordered that the defendant receive a thorough psychiatric evaluation in advance of trial. Neither the examination nor defendant's actions suggested a basis for any finding of incompetence. In order to avoid the potentially prejudicial impact of references to the Black September terrorist organization, the Magistrate Judge ordered that no reference be made to that group or to the PLO by name. Instead, the government and the court referred to them collectively only as "a Palestinian rights organization." Documents in evidence bearing the name Black September or PLO were withheld from the jury.

Pursuant to order of the court, all evidence was made available to the defendant for examination and testing well before the trial. All documents and reports in the files of the FBI and New York City Police were given to the defendant long in advance of trial although the statute required that only some of them be shown defendant and, as to them, only during trial. 18 U.S.C. § 3500 (state-

ment of witness to be shown to defense after witness whose statement is embodied in the document testifies for the government on direct). One hundred and sixty-six documents totalling approximately four hundred pages consisting of the files of the United States Attorney were duplicated and the copies were presented to defense counsel seven months before trial. There were no surprises or "coverup" to support defendant's claim of "frameup."

The defendant has not offered a scintilla of evidence to prove his contention that he did not receive a fair trial. His allegations are belied by the circumstances surrounding every aspect of the proceedings.

### B. *Fairness of Court*

▆ Defense counsel argues that threats previously made against the judge enhance the possibility that he will entertain an animus against this terrorist. It is true that there have been empty threats against the judge by a pathetic half-deranged Vietnam veteran, associates of a Colombian drug cartel hitman and perhaps organized crime figures in connection with prior cases. Moreover, one of senior defense counsel's clients reportedly had two judges of this court, including the one presently assigned to the instant case, on a list of people he planned to kill. How such events would prevent a federal judge from fairly evaluating charges or sentencing this defendant is not explained by the defense. There is not the slightest connection between those threats and this defendant or his counsel. No motion to disqualify the judge was ever made. The point has no merit in fact or law.

## VIII. SENTENCING CONSIDERATIONS

### A. *Generally*

▆ There are three possible purposes in sentencing this defendant. The first is rehabilitation. It is clear from the evidence that rehabilitation is unlikely. The defendant is wedded to terroristic random violence to make a political statement. He has offered no evidence of a change of heart.

▆ A second is incapacitation. This is a proper basis for sentence in this case. It is highly likely that were this defendant released he would continue his dangerous terrorist activities. Defendant has been a member of the PLO since 1965. The hand-written flyers found in the three cars in which the bombs were planted indicates he has had strong ties to "Black September," reportedly one of the most sinister terrorist factions of our time. Among the many heinous crimes for which Black September has claimed responsibility are the assassination of the Jordanian Prime Minister in 1971; the murder of eleven members of the Israeli Olympic Team in Munich, Germany in 1972; the execution of two American and one Belgian diplomats in Khartoum, Sudan in 1973; a commando raid on a TWA airliner in Athens, Greece in 1973, killing three passengers and injuring forty others; the murder of thirty-two passengers waiting to board a Pan American airliner bound for New York City in Rome, Italy in 1973; and the bombings of eight airlines offices in six cities in 1985, killing one and injuring twenty-eight persons.

▆ A third sentencing rationale is general deterrence. It is appropriately applied in this case. A heavy sentence is an appropriate means of bringing to the attention of prospective terrorists that they are not welcome to bomb and kill in this country. They are on notice that our police forces will do all they can to obtain the requisite evidence of their crimes and to hunt them down anyplace in the world. Should they be found guilty after a fair trial, they should realize that they will be punished to the full extent of the law. Terrorist activities such as those revealed in this case, even when bombs do not explode, wreak great havoc. They disturb the peace and tranquility of all our citizens, requiring future security measures that are both costly and hobbling to the free spirit of our open democratic society. The court must also consider the strong national and international policies against terrorists. *See Ahmad v. Wigen,* 726 F.Supp. 389, 402–08 (E.D.N.Y. 1989), *aff'd,* 910 F.2d 1063 (2d Cir.1990) (discussing authorities).

## B. *Affiliation with Terrorist Organizations*

Were the guidelines applicable in this case, the court would take into account the defendant's affiliation with a criminal organization as a basis for an upward departure to provide the maximum sentence permitted by law. *See, e.g., United States v. Rodriguez*, 968 F.2d 130, 139–40 (2d Cir.1992) (head of criminal drug enterprise); *United States v. Mosquera*, 978 F.2d 706 (2d Cir.1992) (connection to Medellin Drug Cartel, described in 803 F.Supp. 611, 612 (E.D.N.Y.1992)); *United States v. Chilli*, 783 F.Supp. 203, 205–07 (S.D.N.Y.1992) (connection to organized crime).

■■■ The present case is not subject to the Sentencing Guidelines. Consequently, this court has full discretion in imposing a sentence up to the maximum provided by statute. *United States v. Giraldo*, 822 F.2d 205, 210 (2d Cir.), *cert. denied*, 484 U.S. 969, 108 S.Ct. 466, 98 L.Ed.2d 405 (1987). *See also United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). For conduct that occurs prior to the enactment of the Sentencing Guidelines judges have "unbridled discretion [to fashion] a sentence." *United States v. Watford*, 894 F.2d 665, 667 (4th Cir.1990).

## C. *1979 Arrest in Germany for Terrorist Activities*

■■■ The government has offered proof that the defendant was arrested using the alias "Sejaan" in Germany in 1979 while in the company of a PLO official who was on his way to Israel to conduct a terrorist mission. The vehicle the men were using contained approximately eighty-eight pounds of high explosives, eight electronic timing-delay devices and eight detonators. Additional incriminating evidence was seized. Sejaan's fingerprints, which were found on one of the blocks of explosive material, matched those of defendant. Sejaan's photograph was a photograph of the defendant.

Defendant urges that this arrest and incriminating evidence not affect the sentence imposed by the court because all charges were dismissed by Germany and the defendant was unconditionally released. Moreover, defendant contends that this fourteen year-old event has little value in light of defendant's "spotless record" since that time. The court in its discretion will not consider this arrest in imposing sentence.

## D. *Effect on Family*

■■■ Defendant requests leniency because of the adverse effect a long prison term would have on his family. His wife and children have written to the court and supplied family pictures. The defendant's family consists of intelligent, well-behaved and handsome people who obviously yearn for the return of defendant. Though they have done no harm, the wife and children will suffer because of defendant's incarceration.

In the realm of criminal sanctions it is the child who suffers for the sin of the parent. Moreover, experience indicates that the descendant is apt to end up, like the model progenitor, an incarcerated criminal passing down bitterness and antisocial attitudes from generation to generation. This is an unavoidable byproduct of our system of punishing a criminal for his or her crimes.

The court deeply regrets the adverse effects on the family. Yet, it must do its duty to the many unknown innocent families who will, the law assumes, be less likely to lose a parent or spouse to random terrorist violence of this defendant and others like him if he is incarcerated.

## E. *Limits Imposed by Italian Authorities*

Defendant argues that this court's power to sentence him is limited by the terms of his extradition because the Italian authorities, as part of the order authorizing extradition, implied that the maximum prison sentence that could be imposed on defendant was a total term of ten years. The facts are to the contrary.

■■■ Nothing in the extradition rulings of the Italian court places a limitation on the length of sentence that may be imposed by this court. The translated version of the decision of the Italian Appeal Court that reviewed the certification of extradition

makes clear that it did not limit this court to imposing a ten year sentence. The Italian court simply noted that under United States law the maximum penalty that could be imposed per count was ten years. It would have been inappropriate under international law for the Italian court to attempt to limit a United States court's exercise of discretion within due process limits. The only limit of the Italian court was that the person extradited not be executed for a capital crime. *Cf., Ahmad v. Wigen,* 910 F.2d 1063, 1067 (2d Cir.1990) (fairness of court trying crime not to be considered by court considering extradition). *Cf.,* the discussion of the *Soering* case excluding capital punishment in requesting state in *Ahmad v. Wigen,* 726 F.Supp. 389, 413–15 (E.D.N.Y.1989).

■ Nor is the court limited to any term by the principle of specialty. The three attempted bombings included in the superseding indictment were related offenses. The Italian court was fully aware that the United States intended to try defendant for all these crimes. The situation is factually almost on all fours with *United States v. Paroutian,* 299 F.2d 486, 490–91 (2d Cir.1962) (no violation of principle of specialty where defendant extradited based on Southern District of New York narcotics indictment was later tried on additional narcotics charges in Eastern District of New York). Moreover, the language of the treaty under which defendant was extradited does not contain language prohibiting the requesting government from trying the accused for any crime committed before the time of his surrender other than the crime for which he was extradited, despite the fact that clauses to that effect are readily available. *See Fiocconi v. Atty. Gen. of the United States,* 462 F.2d 475, 481 (2d Cir.), *cert. denied,* 409 U.S. 1059, 93 S.Ct. 552, 34 L.Ed.2d 511 (1972) (analyzing predecessor Extradition Treaty of 1868 with Italy).

## IX. SPECIFIC SENTENCE

### A. *Consecutive Sentences*

■ In a pre-Guidelines sentence such as this one, the trial court may decide whether the sentences imposed on each count should run concurrently or should be consecutive. *See generally* 3 Charles A. Wright, *Federal Practice and Procedure* § 527 (2d ed. 1982). *See also Callanan v. United States,* 364 U.S. 587, 597, 81 S.Ct. 321, 327, 5 L.Ed.2d 312 (1961) (where defendant commits two separate acts of the same crime, court's authority to sentence consecutively cannot be questioned); *Carmack v. United States,* 296 F.2d 893, 894 (10th Cir.1961) ("It is so firmly established in the law that sentences for separate crimes may be consecutive that there is no need in discussing the proposition at any length."); *Swepston v. United States,* 289 F.2d 166, 168 (8th Cir.1961), *cert. denied,* 369 U.S. 812, 82 S.Ct. 689, 7 L.Ed.2d 612 (1962) ("Consecutive sentences for separate counts of the same indictment ... have long been sanctioned and cases involving them have been before the Supreme Court many times.")

### B. *Prison*

■ This case clearly warrants the maximum penalty. The statute authorizes the court to sentence the defendant to ten years per offense charged, consecutively. 18 U.S.C. § 844(i). The maximum sentence permissible—thirty years—is required for general deterrence and incapacitation.

### C. *Time Credited From Arrest in Italy*

■ Defendant urges that he should be given 451 days' credit towards his sentence for time spent in jail between January 16, 1991 when he was arrested in Italy, and April 12, 1992, when he was extradited to the United States. Defendant will receive credit for time served in Italy in accordance with United States federal lenient practice. The computation of time served will be made by the Attorney General. 18 U.S.C. § 3568 (applicable to sentences for crimes committed prior to Nov. 1, 1987). *See, e.g., United States v. Wilson,* — U.S. —, —, 112 S.Ct. 1351, 1353, 117 L.Ed.2d 593 (1992); *United States v. Edwards,* 960 F.2d 278, 281 (2d Cir.1992).

### D. *Fine*

■ The maximum fine is also imposed. This is $10,000 per count. 18 U.S.C. § 844(i). Consecutive fines total $30,000. While de-

fendant claims no substantial assets, he travels widely and he received ample funds from abroad while he was planting bombs in this country. The PLO and Black September organizations with which he is associated are well financed and in a position to pay the fine imposed on their agent.

## X. CONCLUSION

The defendant's motion for a judgment of acquittal or a new trial is denied. Defendant is sentenced to ten years in prison on each count, the sentences to run consecutively for a total of thirty years in prison, and fines of $10,000 on each count, consecutive, for a total of $30,000 in fines. The court notes that this is a pre-Guidelines sentence and the defendant, therefore, as a matter of statute, is subject to parole. The time of defendant's release is not subject to court control.

SO ORDERED.