UNITED STATES of America,
Plaintiff,

v.

Karim KOUBRITI, Ahmed Hannan,
Abdel Ilah el Mardoudi, and Far-
ouk Ali–Haimoud, Defendants.

No. 01–80778.

United States District Court,
E.D. Michigan,
Southern Division.

March 24, 2003.

Richard G. Convertino, United States
Attorney's Office, Detroit, MI, for Plaintiff.

Richard M. Helfrick, Leroy T. Soles, Federal Defender, Federal Defender Office, James C. Thomas, Joseph A. Niskar, Detroit, MI, Stephen T. Rabaut, St. Clair Shores, MI, Federal Defender, Federal Defender Office, William W. Swor, Margaret S. Raben, Gurewitz & Raben, Kevin S. Ernst, Ernst Assoc., Robert M. Morgan, Detroit, MI, for Defendants.

## OPINION AND ORDER DENYING DEFENDANTS' MOTION TO ADJOURN TRIAL DUE TO WAR IN IRAQ

ROSEN, District Judge.

### I. INTRODUCTION

As the Court embarked upon the process of jury selection in this case, involving charges of conspiracy to provide material support or resources to terrorists, conspiracy to engage in document fraud, and document fraud, the United States commenced hostilities against Iraq. As a result, the national landscape has been reshaped in certain respects, as it is in the wake of any such momentous event. The four Defendants in this case, all of whom are of Middle Eastern ethnicity, contend that this changed national mood is no longer compatible with their constitutional right to a fair trial, at least while fighting continues in Iraq. Consequently, by motion filed on March 20, 2003, they request that their trial be adjourned until the hostilities have ceased.

As discussed in detail below, the Court finds an adjournment legally unwarranted, as well as imprudent. Recent media reports and this Court's own opinions have observed that this is the first post-September 11 case involving allegations of international terrorist support to proceed to trial. Further, three of the four Defendants here were arrested within days of the September 11 attacks, as the direct result of a government effort to locate another individual, Nabil Al-Marabh, who was thought to have knowledge or information concerning those terrorist attacks. Although Defendants have not been linked in any way to the specific events of that day, there is no doubt that charges of the sort made in this case stand in a different light now than before the attacks on New York and Washington. If the war against Iraq has altered the mood of the nation, the impact of September 11 surely has been far greater and more enduring. Moreover, if the present conflict is a reminder of the challenging times in which we live, September 11 is perhaps the font of that wisdom.

The parties and the Court alike have long recognized the shadow that September 11 casts upon these proceedings, and the need to take steps to ensure that Defendants' rights are fully protected in this post-September 11 environment. Most recently, prospective jurors were asked to complete a lengthy and comprehensive questionnaire exploring a number of subjects, including the possible effect of September 11 upon their lives and their ability to serve fairly and impartially. Prospective jurors then were subjected to individual voir dire, where these matters were probed more deeply. Through these and other tools available (and, in many instances, mandated) under this nation's system of justice, the Court is confident that a fair trial can be achieved even in the face of the challenges posed by September 11. These same measures, in the Court's view, are sufficient to ensure that the war in Iraq does not undermine Defendants' right to a fair trial as guaranteed by the Fifth and Sixth Amendments

Practical considerations lead to the same conclusion. As noted, we live in uncertain times, with no assurance that a period of greater clarity and equanimity is near at hand. While the nation's attention today

is focused upon the fighting in Iraq, we do not know whether tomorrow will bring another event of greater and more direct bearing upon the charges brought against Defendants in this case. The Court *can* take account of matters which already have transpired—and, in fact, because the Iraq conflict has been on the horizon for some time now, the Court and counsel have questioned prospective jurors on this issue from the outset, even before hostilities commenced. What the Court *cannot* do, however, is anticipate the gravity and significance of events yet to occur. Nor is the Court willing to speculate that this uncertain future invariably will be more hospitable to Defendants' fair trial rights. Accordingly, for the reasons stated herein and at the March 24, 2003 hearing on Defendants' motion, the Court declines to adjourn the trial in this case.

## II. BACKGROUND

The allegations of this case have been set forth in the Court's prior Opinions, and need not be repeated here. As noted, the Third Superseding Indictment in this case charges Defendants Karim Koubriti, Ahmed Hannan, Abdel Ilah Ed Mardoudi, and Farouk Ali–Haimoud with conspiracy to provide material support or resources to terrorists, conspiracy to engage in document fraud, and document fraud. A pool of over two hundred prospective jurors was asked to complete a 26–page questionnaire in late February of 2003, and individual voir dire commenced on March 18, 2003.

On the evening of March 19, 2003, the United States went to war with Iraq. Yet, even before the commencement of hostili-

ties, the Court and the parties fully anticipated the prospect of war, and the Court instructed that counsel should voir dire on this subject. Thus, from the beginning of voir dire, and before the start of the fighting in Iraq, the Court and counsel have painstakingly questioned each potential juror regarding the impact of war on his or her ability to remain fair and impartial, and this practice has continued now that the military conflict has begun. The prospective jurors were reminded that none of the Defendants is from Iraq—rather, as stated in the initial questionnaire, they hail from Morocco and Algeria—but that they and the people of Iraq share an Arabic national origin. To date, all of the jurors qualified by the Court, and the vast majority of those who were excused for cause, have indicated that the conflict in Iraq would not affect their ability to fairly assess the evidence at trial and impartially render their verdict.[1]

On the morning of March 20, 2003, Defendants filed their present motion requesting that the Court adjourn the trial until the end of the war in Iraq.[2] In support of this motion, Defendants assert that the outbreak of war and the surrounding media coverage will result in a surge of pro-government patriotism and hostility to Middle Easterners such as Defendants, rendering a fair trial by an impartial jury impossible. Defendants further contend that a public perception of possible links between Saddam Hussein and terrorist activities only exacerbates the problem. Finally, Defendants maintain that one specific item of the government's evidence in this case—a day planner containing an al-

---

1. The Court qualified fifteen potential jurors on March 18 and 19, prior to the outbreak of war, and fifteen prospective jurors have been qualified since that time. As stated at the March 24 hearing, the Court will consider whether the initial group of fifteen potential jurors should be further questioned concern-

ing the potential impact of the war now that it has actually begun.

2. Defendants' motion and accompanying brief contain no supporting legal authority, and the Government's response likewise cites no authority.

leged sketch of the United States air base at Incerlik, Turkey—is inextricably intertwined with the war because this same base may be used in military operations against Iraq.

### III. *ANALYSIS*

■ The Fifth and Sixth Amendments to the U.S. Constitution guarantee Defendants "a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Although external influences, such as pretrial publicity or world affairs, might challenge the neutrality of jurors, and thereby threaten prejudice to a defendant's ability to receive a fair trial, the mere existence of such influences does not necessarily undermine constitutional rights. We do not insist, for example, that "jurors be totally ignorant of the facts and issues involved" in a case. *Irvin,* 366 U.S. at 722, 81 S.Ct. at 1642. Rather, the Supreme Court has emphasized:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

366 U.S. at 723, 81 S.Ct. at 1642–43.

■ A juror's assurances on this point are not the end of the matter, however. "[I]t remains open to the defendant to demonstrate the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975) (internal quotations and citation omitted). Plainly, then, whether one is asking if a juror can lay aside his preconceived notions and fair-

ly render a verdict, or instead exploring whether a juror's assertions of neutrality are reliable, the focus in either case is upon the jury voir dire.

■ The Supreme Court has "stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias." *Mu'Min v. Virginia,* 500 U.S. 415, 427, 111 S.Ct. 1899, 1906, 114 L.Ed.2d 493 (1991); *see also United States v. Tocco,* 200 F.3d 401, 411 (6th Cir.2000) ("It is well-settled that the district court enjoys broad discretion in establishing its voir dire procedures."). Likewise, this Court has broad discretion in determining whether to grant a continuance on such grounds as allegedly prejudicial pretrial publicity. *See United States v. Medlin,* 353 F.2d 789, 792 (6th Cir.1965), *cert. denied,* 384 U.S. 973, 86 S.Ct. 1860, 16 L.Ed.2d 683 (1966); *United States v. El–Jassem,* 819 F.Supp. 166, 177 (E.D.N.Y.1993), *aff'd,* 48 F.3d 1213 (2d Cir.1994). As noted in *El–Jassem:*

> A continuance is appropriate only where it would significantly reduce the effect of publicity and warrant compromising the public interest in prompt disposition of criminal charges .... [T]he central issue is whether the jurors have such fixed opinions that they are unable to judge the guilt of the defendant impartially.

*El–Jassem,* 819 F.Supp. at 177 (internal quotations and citation omitted).

Although the circumstances of this case are rather unique, the situation presented in *El–Jassem* was at least somewhat analogous. There, defendant Khaled Mohammed El–Jassem was indicted in 1973 for three attempted car-bombings of Israeli-related targets around New York City, but he evaded capture until 1990, and his trial did not commence until February of 1993.

Two days after jury selection and six days before the start of trial, the World Trade Center was bombed. To protect El–Jassem's fair trial rights, the District Judge conducted additional individual voir dire of each juror. The jurors all reported hearing about the World Trade Center bombing, but they uniformly stated that it would have no effect on their decision in the case and reaffirmed their ability to remain fair and impartial. In light of this voir dire, the Court "concluded that no member of the jury would be influenced by the World Trade Center bombing," and thus denied El–Jassem's motion for a continuance and proceeded to trial as scheduled. 819 F.Supp. at 172.

This was not the end of the matter, however. A few hours into the trial, while the jury was in the courtroom, the Court was informed that the FBI was about to hold a press conference suggesting a Middle Eastern connection to the World Trade Center bombing. The Court immediately sequestered the jury out of concern that this information might prejudice El–Jassem. Over the objections of defense counsel, however, the court proceeded with the trial on the grounds that (i) the sequestered jury was unaware of the Middle Eastern connection to the World Trade Center bombing, (ii) a postponement might lead to an indefinite delay, and (iii) any future jurors likely would have been exposed to more potentially prejudicial information than the current, sequestered jury. 819 F.Supp. at 172–73.[3]

Several of the considerations identified in *El–Jassem* also bear upon the question before this Court. There, as here, the inquiry focused principally upon the juror's responses to individual voir dire directed at the specific external source of potential prejudice. Based upon uniform assurances of juror impartiality despite the World Trade Center bombing, the *El–Jassem* Court concluded that a continuance was unwarranted. Similarly, in the present case, all of the jurors who have been qualified to date have stated during individual voir dire that the conflict in Iraq would not affect their ability to fairly and impartially render a verdict based solely upon the evidence. More generally, each prospective juror completed a lengthy questionnaire exploring, *inter alia*, issues of possible bias against individuals of Middle Eastern origin, and defense counsel were afforded the opportunity to further explore these matters during individual voir dire. Those few individuals who exhibited such potential bias or prejudice were excused for cause. On this record, Defendants face considerable difficulty in establishing a presumption of partiality or prejudice that would justify an adjournment.

To be sure, and as acknowledged earlier, the jury's assurances of impartiality need not be accepted at face value. Yet, Defendants must identify some basis for discounting the statements of the jurors during voir dire. One possible consideration, for example, would be the "length to which the trial court must go in order to select jurors who appear to be impartial." *Murphy*, 421 U.S. at 802–03, 95 S.Ct. at 2037. The Court elaborated:

> In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations will may be drawn into question; for it is then more probable that they

---

**3.** In deciding to continue with the trial, the Court also relied on (i) the maturity and diversity of the jury, (ii) the fact that the only issue at trial was identity, which would be established by objective fingerprint and handwriting evidence rather than eyewitness iden-

tification, and (iii) the Court and the parties' stipulation to take potentially emotional evidence out of the case, such as the potential force of the bombs, the references to the PLO or the Black September organization, and the possible terrorist motive. 819 F.Supp. at 173.

are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it. In *Irvin v. Dowd*, for example, the Court noted that 90% of those examined on the point were inclined to believe in the accused's guilt, and the court had excused for this cause 268 of the 430 veniremen. In the present case, by contrast, 20 of the 78 persons questioned were excused because they indicated an opinion as to petitioner's guilt. This may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own.

*Murphy*, 421 U.S. at 803, 95 S.Ct. at 2037–38 (footnote omitted). This factor is unavailing to Defendants here, however, because the individual voir dire, at least to date, has failed to reveal any sort of widespread prejudice arising from the war in Iraq. To the contrary, only in rare cases have prospective jurors found any link between the ongoing military action overseas and the charges brought against Defendants in this case, and these individuals have been disqualified for cause.

Indeed, the Court finds nothing remarkable or inherently suspicious in the statements of prospective jurors that the war in Iraq will not taint their views about this case. Any possible connection is indirect at best, where Defendants are not of Iraqi origin and are not accused of any activities involving Iraq or Iraqi nationals. Moreover, even if Iraq were somehow implicated in the allegations of this case, many prospective jurors have expressly recognized during voir dire the distinction between nations at war and individuals who reside in warring nations. In addition, while Defendants note in their motion that President Bush has suggested a link between Iraqi leader Saddam Hussein and terrorist organizations, this is only one reason among several given for the war in Iraq. In all of these respects, this case is far different from *El–Jassem*, which involved a terrorist attack upon New York City with a Middle Eastern connection, all on the eve of trial of a defendant of Middle Eastern origin accused of attempted terrorist bombings of various locations in New York City. Nonetheless, even in the face of this more direct connection, and despite the greater likelihood of a prejudicial effect upon the jury, the *El–Jassem* found it sufficient to address the situation through individual voir dire and sequestration rather than adjournment.

Still another factor cited in *El–Jassem* also militates against adjournment here. In that case, the Court cited the dim prospect that a delay would increase the likelihood of impaneling a fair and impartial jury. In this case, as well, the Court finds no basis to conclude that fair and impartial jurors are more difficult to come by now than at the end of hostilities in Iraq. First, it seems likely that attitudes toward the war will evolve as military operations continue and in their immediate aftermath, and the Court is unwilling to speculate that this evolution will invariably result in a less prejudicial atmosphere for Defendants' trial. The opposite could just as well be true, depending upon developments that neither the Court nor the parties can possibly foresee.[4]

4. This has been borne out in the first few days of fighting in Iraq, which have produced ebbs and flows, military advances and losses of lives. If it were ever imagined that the present conflict would be different in this respect from those which have come before, this has proven not to be the case. Yet, this merely underscores the importance of exploring how prospective jurors react to the complexity of war and how this event might affect their views and attitudes.

Perhaps more to the point, as observed at the outset, events could transpire much closer to home that would present a far greater risk of jury taint. The events of September 11 have alerted this nation to the uncertain times in which we live. Though the Court certainly would like to believe that these tensions will gradually recede, it declines to indefinitely .delay these proceedings on the basis of mere conjecture that the future might bring an environment more conducive to identifying fair and impartial jurors. Such speculation is particularly unwarranted where, thus far, the Court and the parties have not confronted any special difficulty in locating prospective jurors who have professed their ability to render a fair and impartial verdict despite the outbreak of war.

The Court recognizes, however, that Defendants have cited certain considerations here which were not addressed in *El–Jassem*. First, Defendants are concerned that the fighting in Iraq will result in attitudes and predispositions which are at once *less* favorable to them and **more** favorable to the prosecution, in light of the public tendency toward greater patriotism and support for the government in times of war. Next, Defendants note that some prospective jurors have expressed concerns about safety and security, and they contend that "these fears will only be exacerbated" now that war has begun. (Defendants' Motion at ¶ 5.)

The Court does not deny these concerns, nor that they could potentially threaten the fairness and impartiality of prospective jurors. Yet, any additional potential for prejudice with the outbreak of war differs only in degree, and not in kind, from the types of concerns acknowledged by the Court and the parties alike throughout these proceedings. If some prospective jurors now express concern for their safety, the parties and the Court were aware all along that some would do so, in light of the government's allegations of support for international terrorism in the wake of September 11. If some jurors now acknowledge a tendency to favor government or law enforcement witnesses or positions, the Court and the parties had planned all along to explore this subject during jury selection, as it naturally arises in any case involving allegations of planned attacks against U.S. interests. In short, the principal measure of juror fairness and impartiality remains voir dire; the onset of war merely requires an additional line of inquiry specifically directed at the concerns raised by the hostilities in Iraq.

This conclusion is confirmed in the case identified in the Court's research as most nearly addressing this issue, *United States v. Giese*, 597 F.2d 1170 (9th Cir.), *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). The defendant in that case, Frank Stearns Giese, was charged and convicted of conspiring to commit offenses against the United States by participating in the January, 1973 bombing of Army and Navy recruiting centers in Portland, Oregon as · a means of dramatizing opposition to the war in Vietnam. Among other challenges to his conviction, Giese argued on appeal that the trial court had not adequately allowed him to explore "prospective jurors' attitudes toward law enforcement personnel, military personnel, the use of firearms, and the Vietnam War." *Giese*, 597 F.2d at 1181.

The Ninth Circuit acknowledged the need to explore these matters, and expressed reservations whether more could have been done in this regard, but nevertheless found that the voir dire conducted by the District Court adequately ensured a fair trial by an impartial jury:

> The amount of time a trial court must spend inquiring into prospective jurors' attitudes· varies with each case. Most

crimes are mundane, and require only a cursory voir dire examination. Crimes of bombing and terrorism, especially if committed as a protest against governmental behavior, more easily arouse the prejudices of prospective jurors, however, and necessitate a more elaborate voir dire. Although [Giese's] activities occurred in 1972 and 1973, near the termination of the Vietnam War, they might have inflamed the passions of at least several prospective jurors, rendering them incapable of performing fairly at his trial. Even in 1974, at the time of [Giese's] trial, many Americans opposed any form of protest against the War, and a still greater number opposed the equation of violence with political expression. Some laypersons might have carried these attitudes with them into a trial of a man accused of conspiring to bomb military recruiting centers. Therefore, it was essential for the trial judge in the present case to examine prospective jurors' attitudes toward [Giese] and the views he represented.

The court thoroughly questioned the first prospective juror, and elicited information about his views toward law enforcement personnel, the armed forces, the use of firearms, Vietnam War protests, and his exposure to pretrial publicity. This inquiry was detailed and comprehensive, and it focused on the areas about which [Giese] desired information. After hearing this juror's answers, [Giese], the government, and the court knew with some certainty whether or not he was qualified to serve at the trial. The court's examination of several other jurors was also beyond reproach. For some jurors, however, the court conducted a more limited inquiry, asking merely if a juror had any responses to questions that the court had asked other prospective jurors.

In the interest of symmetry, a uniform examination of each juror might have been desirable. Our function is not to ascertain whether the voir dire met technical standards of perfection, however. We will not find an examination inadequate unless the district court abused its discretion by failing to ask questions capable of revealing the prejudices of the prospective jurors. In the present case, the court did not ask every juror specific questions about his or her attitudes toward law enforcement and military personnel, the use of firearms, and the Vietnam War. However, each juror was asked, at a minimum, to consider the more detailed questions directed at the previous jurors and to inform the court of any different responses which these queries elicited.

After observing the amount of time required for a full-scale examination of each juror, the district court had the authority to adopt a more compact mode of inquiry .... The questions propounded by the district court in [this case] succeeded in ferreting out jurors who were incapable of serving impartially. In response to the court's general question that incorporated the more specific questions asked of other jurors, several prospective jurors expressed strong feelings about law enforcement personnel and the Vietnam War. These jurors did not serve on the panel which tried [Giese].

At the close of the initial voir dire, the court permitted defense counsel to suggest additional questions to ask the jurors. Although the court refused to ask requested questions about President Ford's conditional amnesty plan and his pardon of former President Nixon, it did honor most of the other requests. This procedure gave defense counsel an opportunity to participate in the voir dire and to ensure that jurors with questionable qualifications were eliminated.

*Giese,* 597 F.2d at 1181–82 (footnotes and citations omitted). In the present case, the Court's and counsels' individual voir dire of each prospective juror has been much more searching than the examination upheld in *Giese.* In addition, the inquiry here, as in *Giese,* has thus far succeeded in disqualifying those potential jurors—to date, quite few in number—whose responses have suggested a potential for partiality or prejudice.

Finally, the Sixth Circuit decisions addressing the issue of pretrial publicity provide further support for this Court's reliance upon individual voir dire. In these decisions, the Sixth Circuit has noted the distinction drawn by the Supreme Court between cases where prejudice to the defendant has been presumed despite juror assertions of impartiality, and cases where the defendant must show actual prejudice to his fair trial rights. *See, e.g., Ritchie v. Rogers,* 313 F.3d 948, 952 (6th Cir.2002); *DeLisle v. Rivers,* 161 F.3d 370, 382–83 (6th Cir.1998), *cert. denied,* 526 U.S. 1075, 119 S.Ct. 1476, 143 L.Ed.2d 559 (1999). As to the former, the Sixth Circuit has observed:

> The category of cases where prejudice has been presumed in the face of juror attestation to the contrary is extremely narrow. Indeed, the few cases in which the [Supreme] Court has presumed prejudice can only be termed extraordinary, and it is well-settled that pretrial publicity itself—"even pervasive, adverse publicity"—does not inevitably lead to an unfair trial. As the Court observed in *Murphy,* "indicia of impartiality" on the part of a jury have thus far been disregarded only in those cases "where the general atmosphere in the community or courtroom is sufficiently inflammatory." Thus, it is beyond question that mere prior knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the merits, does not in and of itself

raise a presumption of jury taint; such a standard would be certainly unsalutary, and likewise impossible to achieve . . . .

*DeLisle,* 161 F.3d at 382 (citations omitted).

Upon surveying these cases of presumed prejudice, the Sixth Circuit noted that they featured such circumstances as pervasive, inflammatory media coverage in a small town, resulting in ninety percent of prospective jurors having formed some opinion about the defendant's guilt; the repeated television broadcast of a lengthy interrogation in which the defendant confessed to bank robbery, kidnaping, and murder; and a circus atmosphere of chaos in the courtroom itself. *See DeLisle,* 161 F.3d at 383–85. Needless to say, though the present case poses certain challenges, nothing has occurred to date, either within the courtroom or in the world at large, that would give rise to a presumption that a fair trial cannot be achieved here.

Under anything other than such "extraordinary" circumstances, the defendant must establish actual prejudice. The principal focus of this inquiry is the juror selection process, and particularly voir dire. *See Ritchie,* 313 F.3d at 956–62. Plainly, Defendants cannot demonstrate actual prejudice at this juncture, where voir dire is still ongoing, and where the responses of prospective jurors to date do not evidence a widespread inability to leave considerations of the war in Iraq to the side and impartially render a verdict based on the evidence presented at trial. Though the Court will remain vigilant to this possibility, and expects that defense counsel will do likewise, the Court sees no basis for concluding that an adjournment is necessary to ensure Defendants' fair trial rights.

## IV. CONCLUSION

Defendants rightly state in their motion that these proceedings are "emotionally

charged." (Defendants' Motion at ¶ 3.) After September 11, charges of the sort brought in this case are likely to draw more attention and stir more emotion for some time to come. Moreover, the Court fully recognizes Defendants' concern that the ongoing war in Iraq further contributes to the anxieties and uncertainties among the pool of prospective jurors in this case, and that a more extended conflict might heighten these tensions.

Yet, none of this warrants placing the system of trial by jury on indefinite hold. Be the ordeal in Iraq short or long, we are in an advantageous position to meet each challenge as it arises, and to continue on through to the end of trial. The jury system itself comes equipped with tools for ensuring that defendants receive fair trials even under challenging circumstances, and for determining whether the atmosphere surrounding a trial is so rife with potential for prejudice that a continuance, change of venue, or other measures are necessary to ensure a fair trial. Chief among these tools is voir dire, which the Court and counsel have extensively employed—and will continue to employ—in this case. To date, this examination of prospective jurors has not disclosed that the war in Iraq poses a threat to the impaneling of a fair and impartial jury.

For these reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' March 20, 2003 Motion to Adjourn Trial is DENIED.